THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| NOEL NIGHTINGALE; and THE NATIONAL FEDERATION OF THE BLIND, INC., | Case No. 2:14-cv-1286-RAJ |
| Plaintiffs, | |
| v. | CONSENT DECREE |
| SEATTLE SCHOOL DISTRICT NO. 1, d/b/a Seattle Public Schools, | |
| Defendant. | |
| SEATTLE SCHOOL DISTRICT NO. 1 d/b/a Seattle Public Schools, | |
| Third-Party Plaintiff and Counterclaim Defendant, | |
| v. | |
| EDLINE, LLC, a Delaware limited liability company, | |
| Third-Party Defendant and Counterclaim Plaintiff. | |

CONSENT DECREE
CASE NO. 2:14-cv-1286-RAJ

10824.01 ii246701

<u>**CONSENT DECREE**</u>

## I.    INTRODUCTION

1.      On August 20, 2014, Plaintiff Noel Nightingale, who is blind, sued SPS, alleging, *inter alia*, that SPS excluded her from participation in and the benefit of SPS's services, programs, and activities, discriminated against her on the basis of disability, and failed to take appropriate steps to ensure equally effective communication with her in violation of Title II of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12131–34 (the "ADA") and Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 ("Section 504"), and their implementing regulations.  (Dkt. No. 1).

2.      The National Federation of the Blind ("NFB"), also a Plaintiff, is a membership organization of blind persons, their families, and friends, and includes both blind students and blind parents who are or will be participating in the programs and activities of the Seattle Public School District.

3.      Ms. Nightingale alleges that, by denying her access to the SPS website and the ST Math program, SPS denies her an opportunity equal to that afforded sighted parents to informational materials and educational technology and, as a result, denies her the opportunity to participate in her children's education, a benefit provided to all sighted parents and to which she is entitled under the ADA and Section 504. The NFB alleges that SPS's use of websites and educational technology that are inaccessible to blind parents or students violates its members' rights under the ADA and Section 504.

4.      This Consent Decree ("Decree") provides timetables, standards, and specific steps that SPS will follow to provide individuals with disabilities equal opportunity to participate in and

1

benefit from SPS's services, programs, and activities, as SPS increasingly relies on web-based, digital, and emerging technologies.

5.      This Decree is entered into by Plaintiffs Noel Nightingale and the NFB, and Defendant SPS.

6.      SPS denies that it has violated the ADA, Section 504, or any other law. Its consent to this Decree is not an admission of liability, but is prompted by a desire to resolve the controversy between the parties in a mutually beneficial manner and in exchange for full and final resolution of Plaintiffs' claims.

## II.      DEFINITIONS

7.      Terms in this Decree have the same meaning as defined in the Title II regulation at 28 C.F.R. § 35.104 and in the Section 504 regulation promulgated by the U.S. Department of Education at 34 C.F.R. § 104.3.

8.      The terms "conformance" or "conform" have the same meaning as used in the Web Content Accessibility Guidelines 2.0.

9.      "Equally effective alternate access" with respect to electronic and information technology means an alternative format or medium that communicates the same information as accurately and in as timely a fashion as does the original format or medium and that is appropriate to the disability of an individual.  To provide equally effective alternate access, aids, benefits, and services are not required to produce the identical result or level of achievement for persons with and without disabilities, but must afford persons with disabilities equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs.  SPS is not required to take any

2

action that results in a fundamental alteration or undue financial and administrative burden, but must nevertheless ensure that, to the maximum extent possible, individuals with disabilities receive the benefits or services provided by the public entity.

10.     "Information Technology" means any equipment or interconnected system or subsystem of equipment, that is used in the automated acquisition, storage, manipulation, management, movement, control, display, switching, interchange, transmission, or reception of data or information. The term Information Technology includes computers, ancillary equipment, software, firmware and similar systems.

11.     "Electronic and Information Technology" (EIT) includes information technology and also any equipment or interconnected system or subsystem of equipment that is used in the creation, conversion, or duplication of data or information. The term Electronic and Information Technology includes, but is not limited to, telecommunications products (such as telephones), information kiosks, internet and intranet websites, electronic books and electronic book reading systems, search engines and databases, learning management systems (as defined *infra* paragraph 12), instructional technology and multimedia, district standardized testing functions, event and school calendars, webinars, newsletters, and survey instruments.

12.     A "learning management system" (LMS) means a software application made available by SPS through the Internet or its Intranet that has the primary purpose of collecting and delivering course content, including syllabi, assignments, grades, educational materials, presentations, examinations, and study materials.

13.     "Fundamental Alteration" means a change to SPS's service, program, or activity that alters the nature of the service, program, or activity.  Where SPS can document that providing

3

accessibility would require a fundamental alteration, SPS will take any other action that would not result in such an alteration but would nevertheless ensure that, to the maximum extent possible, individuals with disabilities receive the benefits or services provided by SPS.

14.      "Timely" and "timeliness" mean access in sufficient time for the person with the disability to have an equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as persons without disabilities.

15.      "Undue financial and administrative burdens," or "undue burdens," are created when a proposed course of action would result in significant difficulty or expense.   Where SPS can document that providing accessibility would cause an undue burden as set forth in this Consent Decree, SPS will take any other action that would not result in such an undue burden but would nevertheless ensure that, to the maximum extent possible, individuals with disabilities receive the benefits or services provided by SPS.

## III.      AGREED RESOLUTION

16.      Plaintiffs and Defendant (the Parties) agree that it is in the Parties' interest to resolve this lawsuit without further litigation.  Accordingly, the Parties agree to the entry of this Consent Decree. In full and final resolution of this action, the Parties hereby **AGREE** and the Court expressly **APPROVES, ENTERS, AND ORDERS** the following:

## IV.      TERMS OF AGREEMENT

General Non-Discrimination Obligations

17.      Defendant will comply with the requirements of the ADA and Section 504, and their implementing regulations in regards to the actions taken pursuant to this Decree.

4

Evaluating the Accessibility of Technology and Content

18.	In determining whether an individual with a disability is provided an equal opportunity to participate in and benefit from SPS's curricular and supplemental aids, benefits, and services, SPS will evaluate whether, with respect to websites, the standards of WCAG 2.0 AA are met, and, with respect to all other  technology governed by this Decree,  whether the disabled student can acquire the same information, engage in the same interactions, and enjoy the same services as nondisabled students with substantially equivalent ease of use. In that connection, SPS shall consider, where relevant, the following standards:

a.	Web Accessibility Initiative Accessible Rich Internet Applications Suite (WAI-ARIA) 1.0 for web content;

b.	The W3C's Authoring Tool Accessibility Guidelines (ATAG) 2.0 for software used to create web content;

c.	The W3C's User Agent Accessibility Guidelines (UAAG) 1.0 for web browsers, media players, and assistive technologies;

d.	The W3C's Guidance on Applying WCAG 2.0 to Non-Web Information and Communications Technologies (WCAG2ICT) for non-web software and content;

e.	The W3C's MathML 3.0 specification for digital mathematical and scientific notation;

f.	The Braille Authority of North America's (BANA) Guidelines and Standards for Tactile Graphics (2010) and Guidelines for the Production of Braille Materials

5

through the Use of Braille Production Software (2007) for hardcopy Braille; and

g. The DAISY Consortium's Digital Accessible Information System (DAISY) Standard or the International Digital Publishing Forum's (IDPF) EPUB 3 specification for digital publications and documents.

<u>Accessibility Coordinator</u>

19.     Within six (6) months of the entry of this Decree, SPS will appoint or hire an Accessibility Coordinator. The Accessibility Coordinator will report directly to a cabinet level official designated by the Superintendent and:

a.  Will be knowledgeable concerning:

1.  Accessibility and usability of web content;

2.  Accessible document development and remediation;

3.  Accessibility and usability of equipment;

4.  Testing and evaluating the accessibility of web and other technologies;

5.  This Decree; and

6.   State and federal laws related to accessibility, including the ADA and Section 504, and their implementing regulations.

7.  The appropriate provision of auxiliary aids and services for students with disabilities in non-electronic or non-digital formats, such as Braille hard copy, tactile graphics, large print hardcopy, sign language interpretation;

8.  Standards published by the World Wide Web Consortium, such as WCAG 2.0, ATAG 2.0, UAAG 1.0, WAI-ARIA, and MathML; and

6

9.  Publishing standards for accessible electronic books and documents, such as the DAISY Standard and EPUB 3;

b.  Will be responsible for overseeing, managing, and coordinating SPS's implementation of this Decree, including causing to be conducted a district-wide accessibility audit (as discussed *infra* paragraph 35);

c.  Will be responsible for reporting and documenting to the Chief Information Officer that all new web applications or templates have been made accessible pre-release; post-release accessibility bugs have been remediated; and whether the requirements set forth in this Decree have been met and, if not, what has not been satisfied and why.

Accessible Educational Resources Portal

20.    Within six (6) months of the entry of this Decree, SPS will create webpages (Accessible Educational Resources Portal) accessible from its homepage that:

a.  Conform to WCAG 2.0 AA; and

b.  Identify resources for SPS employees to effectively communicate with students, parents, and others with disabilities through various technologies, and provide notice to students, parents, and others with disabilities about these policies, procedures, and resources.

21.    SPS will communicate to all SPS employees, students, and parents describing and providing a hyperlink to the Accessible Educational Resources Portal.   The Accessible Educational Resources Portal will include:

a.  The name and contact information for the Accessibility Coordinator;

7

b.   Links to resources to assist in preparing accessible PDFs, presentations, and other documents; and

c.   A link to an e-mail address for the Accessibility Coordinator to allow any party to submit proposed or in-use curricular or supplemental EIT for inquiry into whether such technologies are accessible, or other queries with respect to accessible educational content or technology, or to report access barriers concerning the use of any technology by SPS, including the website. The Accessibility Coordinator will regularly monitor the submissions and will respond to them in a reasonable amount of time.

<u>Web Content Accessibility</u>

22.    SPS will provide web pages, web applications, and web content on its websites and subdomains in conformance with WCAG 2.0 AA within eight (8) months of the execution of this Decree.

23.    SPS will provide to the Plaintiffs SPS's plan to conform pre-existing web pages, web applications, and web content posted since January 2012 with WCAG 2.0 AA within eighteen (18) months of the entry of this Decree.

24.    SPS will modify legacy pages (i.e., pages published prior to January 2012) and archive content (i.e., content no longer in use but subject to records retention schedules) to conform to WCAG 2.0 AA if specifically requested by an individual with a disability; however, SPS may provide equally effective alternate access of legacy and archive content until conformance is accomplished.

8

25.     SPS will ensure third-party content, websites, or applications procured by SPS to convey information or complete transactions with students and/or parents (e.g., any LMS or "The Source"):

1.   Conforms with WCAG 2.0 AA and this Decree; or

2.   Until such time that conformance is achieved, ensure that SPS provides equally effective alternate access to qualified individuals with disabilities.

Web Accessibility Testing

26.     Within six (6) months of the entry of this Decree, SPS will obtain an automated accessibility testing tool to evaluate conformance of its web content with WCAG 2.0 AA. SPS may contract with a testing service provider in lieu of acquiring an automated accessibility testing tool.

27.     At least once every four (4) months for the term of this Decree, SPS will conduct automated accessibility tests of its websites and third party websites procured by SPS to convey information, or for completion of transactions or trainings, to identify where web content fails to conform to WCAG 2.0 AA and will send the results of these tests to the Plaintiffs.

28.     Within ten (10) months of the entry of this Decree, and before any substantial change to SPS's website is made available to the public, such changes will be tested by individuals with disabilities, at a minimum individuals who are blind, to identify any accessibility barriers not otherwise apparent through automated testing.

Modification of Bug Fix Priority Procedures

29.     Within three (3) months of the entry of this Decree, SPS will modify its existing bug fix practices and procedures to ensure that any bugs that create nonconformance with the terms of

9

this Decree are remedied with the same level of priority, (e.g., speed and resources used to remediate) as any other equivalent loss of function for individuals without disabilities. SPS will make the Modified Bug Fix Priority Procedures available to the Plaintiffs for review and comment no later than ten (10) business days before their implementation.

Accessible Technology Training

30.      During the 2015-2016 academic year, and for anyone newly hired in the positions delineated in paragraph 31(a)-(d) during the term of this Decree, SPS will provide mandatory accessible technology training (Accessible Technology Training) to:

    a.  The Accessibility Coordinator;

    b.  Designated employees of the Department of Technology, Communication Department, Curriculum and Instruction Department, Special Education Department, Media Operations Department, and Office of the School Board responsible for writing or publishing content to SPS's websites or converting hardcopy materials into electronic and alternate formats, except where a contractor is specifically retained for its expertise in converting materials into accessible formats;

    c.  Designated employees of the Purchasing Department, Contract Department, and Curriculum and Instruction Department involved in procurement of curricular and supplemental technology and digital content; and

    d.  Section 504 coordinators, ADA coordinators, and Special Education Department employees, responsible for providing assistive technologies and other

10

auxiliary aids and services used by individuals with disabilities, including those who are blind or low vision.

31.     The Accessible Technology Training for those individuals identified in Paragraph 31 will cover:

   a.  Common assistive technologies and other auxiliary aids and services used by individuals with disabilities, including those who are blind or low vision, in interacting with computers, websites, equipment, and for use in learning in and outside of the classroom, including non-electronic formats;

   b.  Common technological accessibility barriers to individuals with disabilities, including those who are blind or low vision, on websites and in various document formats (Word, Adobe PDF, PowerPoint, etc.);

   c.  Common methods, resources, personnel, and lengths of time for ensuring the accessibility of word processing, spreadsheet, and presentation documents (Word, Adobe PDF, PowerPoint, etc.) and multimedia (e.g., videos on the web); and

   d.  An overview of accepted accessibility standards, including WCAG 2.0 and, when applicable, UAAG 1.0, ATAG 2.0, MathML, WAI-ARIA, WCAG2ICT, DAISY, and EPUB3.

32.     In addition to the training requirements identified in Paragraphs 31-32, during the 2015-2016 school year, and thereafter for anyone newly hired in such positions during the term of this Decree, SPS will provide training for its teachers and building administrator and support personnel, that will cover:

11

    a.  The requirements of Title II of the ADA related to accessibility issues, including the necessity of utilizing accessible EIT;

    b.  The availability of the Accessible Educational Resources Portal; and

    c.  Practical guidance on creating accessible documents and content, and posting or disseminating such content in accessible formats.

Technology Procurement

33.    Within six (6) months of the entry of this Decree and for its term, SPS will take the following steps in its procurement process of EIT procured at a building-wide or larger level for use by its students or parents:

    a.  SPS will request, obtain, review, and evaluate each vendor's most recent accessibility testing results;

    b.  Any Request for Proposal (RFP) by SPS will include a requirement that the vendor:

        1.  Specify what web content and software conform to relevant legal standards governing accessibility and what equipment, devices, or hardware can be used by and are accessible to individuals with disabilities; and

        2.  Agree to make nonconforming web content and software conform to relevant legal standards governing accessibility and make equipment, devices, and hardware usable by individuals with disabilities; or

        3.  If the vendor cannot so agree, then require that the vendor detail how it will support SPS in providing equally effective alternate access for

12

        nonconforming web content and software and unusable equipment, devices, and hardware.

    c.   SPS will use due diligence in seeking to include language in all EIT contracts requiring vendors to agree that they will assist SPS in the resolution of accessibility complaints and indemnify and hold SPS harmless in the event of claims arising from inaccessibility.

Audit, Evaluation, and Corrective Action Plan

34.     Within twelve (12) months of the entry of this Decree, the Accessibility Coordinator will cause to be conducted a district-wide accessibility audit of curricular and supplemental EIT and digital content acquired from third-party vendors.  The accessibility audit will examine the accessibility and usability of these resources for students and prospective students who have disabilities.

35.     Within sixteen (16) months of the entry of this Decree, the Accessibility Coordinator will provide written findings to the Superintendent of the accessibility audit and recommendations on accessibility improvements to comply with this Decree (Accessibility Audit Corrective Action Plan).  These written findings will be reviewed by the appropriate committee of the School Board.

36.     Within eighteen (18) months of the entry of this Decree, SPS will adopt, post on the Accessible Educational Resources Portal, and begin implementation of an Accessibility Audit Corrective Action Plan to resolve the findings of the accessibility audit, which shall include a date by which the findings will be resolved. Such date shall be no later than three (3) years from the date of entry of this Consent Decree.

13

Undue Burden and Fundamental Alteration Determinations

37.      For any technology-related requirement in this Decree for which SPS asserts undue burden or fundamental alteration, such assertion may be made only by the Superintendent of SPS or by an individual designated by the Superintendent after considering all resources available for use in the funding and operation of the service, program, or activity. The assertion must be accompanied by a written statement of the reasons for reaching that conclusion, including the cost of meeting the requirement and the available funding and other resources. If such a determination is made, SPS will take, and will specify in the written statement, any other action that would not result in such an alteration or such burdens but would nevertheless ensure that, to the maximum extent possible, individuals with disabilities receive the benefits or services provided by SPS by providing equally effective alternate access as defined Paragraph 9 *supra* and shall promptly provide NFB with a copy of the written statement.

## V.      MONETARY RELIEF

38.      Within thirty (30) days of the execution of this Decree, SPS will pay $5,000 to Noel Nightingale.

## VI.      ATTORNEYS' FEES

39.      Within thirty (30) days of the execution of this Decree, SPS will pay reasonable attorneys' fees in the amount of $80,412.81 incurred by the NFB and Ms. Nightingale in pursuing this matter.

## VII.      REPORTING AND ENFORCEMENT, AND OTHER PROVISIONS

40.      Within twelve (12) months of the entry of this Decree, and annually after the entry and for the term of this Decree, the Accessibility Coordinator or a designee will submit a report to the

14

Plaintiffs detailing SPS's compliance with this Decree. Each report will identify and provide the written statements supporting any determination of undue burden or fundamental alteration, and how equally effective alternate access was provided, if applicable.

41.     If the Plaintiffs believe that this Consent Decree or any portion of it has been violated, they will give notice (including reasonable particulars) of the violations to SPS.  SPS must respond to this notice as soon as practicable but no later than thirty (30) days thereafter. SPS's response will include a confirmation or denial of the issue and a plan to resolve the issue, if applicable.  The Parties will negotiate in good faith in an attempt to resolve any dispute.  If the Parties are unable to reach a mutually acceptable resolution within sixty (60) days of SPS's response, the Plaintiffs may seek court enforcement of this Decree.

## VIII.   EXPIRATION OF THE CONSENT DECREE

42.     This Consent Decree constitutes a full and final resolution of all of Plaintiffs' claims against SPS in this action. This Consent Decree is effective as of its entry and will be in effect for three (3) years and six (6) months, during which time the Court retains jurisdiction over this matter. The Consent Decree will expire at midnight on the date which is three (3) years and six (6) months after its entry by the Court.

## IX.     OTHER PROVISIONS

43.     This Consent Decree does not purport to remedy any violations or potential violations of the ADA or any other law, other than the violations alleged in Plaintiffs' Complaint in this action.

44.     This Consent Decree contains the entire agreement of the Parties concerning the subject matter described in the Complaints, and no other statement, promise, or agreement, either written

15

or oral, made by any party or agent of any party, that is not contained in this Consent Decree will be enforceable.

45.     Any modification of this Consent Decree requires the written consent of the Parties and the approval of the Court; provided that, the Parties may agree in writing to extend applicable deadlines specified in this Consent Decree, other than its termination.

46.     This Consent Decree will be binding on SPS and its respective subsidiaries, agents, employees, officers, contractors, and successors.

47.     Failure by the Plaintiffs to enforce this Decree, or any part of it, pursuant to its terms with respect to any instance or provision will not be construed as a waiver to enforce the  with regard to any instances or provisions.

48.     SPS will provide a copy of the Decree to any person upon request.

49.     The Parties agree that, as of the entry of this Consent Decree, litigation is not "reasonably foreseeable" concerning the matters described in the Complaint.  To the extent that any of these parties previously implemented a litigation hold to preserve documents, electronically stored information, or things related to the matters described in the Complaint, the party is no longer required to maintain this litigation hold.  Nothing in this paragraph relieves any party of any other obligations imposed by this Consent Decree.

50.     All materials to be submitted to the Plaintiffs will be sent to Brown, Goldstein & Levy, 120 East Baltimore Street, Suite 1700, Baltimore, Maryland, 21202.

51.     The signatories represent that they have the authority to bind the respective parties identified below to the terms of this Decree.

**SO ORDERED** this \_\_\_ day of _____, 2015.

16

10824.01 ii246701

_____
Honorable Richard A. Jones
United States District Judge
United States District Court,
Western Division of Washington-
Seattle

**AGREED AND CONSENTED TO:**

**FOR PLAINTIFFS:**

_____
NOEL NIGHTINGALE
Plaintiff
Dated:  September 25, 2015

_____
MARK RICCOBONO, President
National Federation of the Blind
Dated:  September 25, 2015

**FOR THE DEFENDANTS:**

_____
Dr. Larry Nyland
superintendent@seattleschools.org
Superintendent
SEATTLE PUBLIC SCHOOL
Office of the Superintendent
Dated:  September 28, 2015

_____
JOHN CERQUI
JCERQUI@seattleschools.org
Acting General Counsel
SEATTLE PUBLIC SCHOOLS
Office of the General Counsel
Date:  September 25, 2015

17